[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 19, 2003
THOMAS K. KAHN
CLERK

No. 02-15981

D. C. Docket No. 00-01646 CV-WBH-1

REGIONS BANK,
d.b.a. Regions Funding,

Plaintiff-Appellant,

versus

THE PROVIDENT BANK, INC.,
d.b.a. Provident Consumer Financial
Services, Inc.,

Defendant-Cross-Claimant-
Appellee,

MORNINGSTAR MORTGAGE BANKERS,
INC., ANGELA DAIDONE,

Defendants-Cross-Defendants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(September 19, 2003)**

Before BARKETT, MARCUS and ALARCÓN*, Circuit Judges.

ALARCÓN, Circuit Judge:

Regions Bank ("Regions") appeals from the final order and judgment of the district court dismissing this action after granting The Provident Bank, Inc.'s ("Provident") motion for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure. Regions seeks reversal on the ground that the district court erred in ruling that Regions's state law claims were preempted by Article 4A of the Uniform Commercial Code ("U.C.C.") and that genuine issues of material fact exist regarding whether Provident knew or should have known that funds it received from Morningstar Mortgage Bankers, Inc. ("Morningstar"), by means of a wire transfer, had been fraudulently obtained.

We affirm because we conclude that Regions failed to demonstrate that Provident knew or should have known that funds transferred from Fleet Bank were fraudulently obtained by Morningstar.

I

Regions and Provident are commercial banks that act as "warehouse

---

*Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

lenders" for the residential real estate market. Provident[1] and Regions advance money to independent mortgage lenders, known as originators, who fund loans to home buyers. Under the typical warehouse loan agreement, the warehouse lender wires the funds requested by the originator to a closing agent or attorney who is instructed to disburse the funds to the home buyer. The original note signed by the home buyer serves as collateral for the loan, and the warehouse lender maintains a security interest in the property purchased with the loan. In order to pay off its debt with the warehouse lender, the originator sells the loan to a third party investor at a premium.

On August 25, 1998, Provident entered into a warehouse loan agreement with Morningstar [hereinafter Provident Warehouse Line]. Morningstar agreed to use the money lent to it by Provident to make mortgage loans to home buyers. Morningstar promised to use the proceeds from sales of the individual mortgage loans to third party investors to pay off its debt to Provident. If Morningstar failed to locate an investor to purchase its loans, and Provident's funds remained outstanding for more than the time period specified by Schedule A of the particular loan agreement, Morningstar agreed to repay Provident or purchase the

---

[1]Provident's transactions regarding its warehouse lines are handled by the "warehouse funding unit."

3

loans itself.

Provident twice suspended Morningstar's warehouse line of credit, in January 1999, and March 2000, in response to its failure to make prompt payments on the loans or to sell them to third party investors. On April 4, 2000, John Haag Jiras, a closing attorney, informed Provident that his signature had been forged on closing documents pertaining to the Closing Agent Agreement and Errors and Omissions insurance policy that had been submitted to Provident by Morningstar, and that the FBI was investigating his allegations. Shortly thereafter, an FBI agent contacted Provident's in-house counsel regarding the investigation instigated by Mr. Jiras.

On April 5, 2000, Provident sent a letter to Angela Daidone, president and CEO of Morningstar, demanding repayment of all outstanding loans within ten days. Ms. Daidone informed Provident that she owned ten acres of land in Long Island, New York that she would liquidate, and that she would wire the funds into the demand deposit account ("DDA") that Morningstar maintained at Provident Bank.[2] Morningstar had previously reimbursed Provident from monies deposited in this account.

---

[2]A DDA is a personal account that is held at a bank and used by an individual or business.

On April 6, 2000, Provident discovered that First Union Mortgage Corporation ("First Union") possessed the original note for one of Provident's outstanding home loans. On March 29, 2000, First Union had forwarded the funds to pay for the loan to Chase Manhattan Bank ("Chase"), for deposit into Morningstar's Paine Webber account.

Meanwhile, on April 4, 2000, Morningstar entered into a warehouse loan agreement with Regions [hereinafter Regions Warehouse Line]. Pursuant to this agreement, Morningstar requested that Regions transmit funds by wire to the escrow account of closing attorneys Weider & Mastroianni ("W&M") at Fleet Bank. On April 10, 2000, Morningstar requested $171,720 from Regions to fund a loan for Ever T. Aguado. Regions wired the requested funds to Fleet Bank. Regions instructed W&M that the funds were to be used to pay for the loan to Mr. Aguado.

On April 11, 2000, Morningstar requested $465,000 in order to fund a loan for Marjorie Crawford. Regions wired this amount to the W&M escrow account at Fleet Bank on April 11, 2000, with instructions that the funds were for a loan for Ms. Crawford. On the same date, Peter Mastroianni of W&M contacted Ms. Daidone at Morningstar for further instructions regarding how the funds in the escrow account should be put towards the loans for Mr. Aguado and

Ms. Crawford. Ms. Daidone told Mr. Mastroianni that Regions had transferred funds to W&M's escrow account in error. She asserted that she was the intended recipient of the funds. Ms. Daidone requested that W&M instruct Fleet Bank to wire $171,720 of the funds in W&M's escrow account to Morningstar's DDA at Provident. On April 11, 2000, Fleet Bank wired the $171,720 to Morningstar's DDA at Provident. The payment order from Provident to Fleet Bank listed Morningstar's account number at Provident Bank and stated that "Orig to BNF info: Re: Aguado–Morningstar Mortgage Bankers, Inc."

After Fleet Bank transferred $171,720 to Morningstar's DDA at Provident, Ms. Daidone informed Provident that funds were available in Morningstar's DDA to settle an outstanding loan on the Provident Warehouse Line. On April 12, 2000, Provident debited Morningstar's account by the $171,720 and credited the Provident Warehouse Line. On April 12, 2000, at Morningstar's request, Regions wired $162,000 to the W&M escrow account, with instructions to fund a loan for Mario Graziosi.

On April 11 or 12, 2000,[3] FBI agents informed the internal security department at Regions that it had been monitoring the wire transfers from Regions

---

[3]The record is unclear regarding whether the FBI contacted Regions on April 11 or April 12.

to W&M. Thomas J. Holland, Senior Vice-President of Regions Mortgage, testified at his deposition that the FBI agents stated that the FBI "had monitored Ms. Daidone and that they felt there was a major problem with her, and they were going to try to arrest her almost immediately." The FBI also informed Regions that it should attempt to retrieve monies that Regions had wired for the closing of particular loans immediately.

On April 13, 2000, Ms. Daidone instructed Fleet Bank to wire $627,000 that Regions had wired to the W&M escrow account on April 11 and 12, 2000 to Morningstar's DDA at Provident. The payment order to Provident from Fleet Bank listed Morningstar's account number and stated that "Orig to BNF info: Re Graziosi $162,000 Crawford $465,000." The same day, Ms. Daidone advised Provident that it could apply the funds wire-transferred by Fleet Bank, against Morningstar's outstanding debt.

At 5:42 p.m. on April 13, 2000, Jaime Robison of Fleet Bank placed a call to a suburban Cincinnati branch of Provident Bank. Ms. Robison spoke with an unidentified Provident employee. The Provident employee informed Ms. Robison that the DDA belonged to Morningstar and that the funds were still in that account. Ms. Robison informed the Provident employee that "it was possible that the funds had been sent to the wrong institution."

Immediately after speaking with the Provident employee, Ms. Robison called an employee in the funds transfer department of Fleet Bank to initiate the process of recalling the wire transfer. Ms. Robison was informed that she would need to draft a supporting memo requesting the recall and specifying the beneficiary information and dollar amounts of the transfers. Ms. Robison drafted the memo on April 13, 2000 and sent it to Fleet Bank's funds transfer department. Fleet Bank did not contact Provident on April 13, 2000.

On April 13, Regions's attorney, John G. Aldridge, contacted Peter Mastroianni at W&M and asked him to attempt to reverse the wire transfers that had been sent to Morningstar's DDA at Provident. Mr. Aldridge testified at his deposition that it was his understanding on April 14, 2000, that Mr. Mastroianni "had discussed the situation with his bank and this bank was taking the appropriate steps to reverse the wire transfer." There is no indication in the record that Mr. Mastroianni contacted Provident directly in an effort to reverse the wire transfers. Regions also asked the FBI to attempt to locate and seize the funds. Regions did not contact Provident regarding the funds in Morningstar's DDA until April 17, 2000.

On April 14, 2000, around 10:00 a.m., Provident applied the $627,000 in Morningstar's DDA, that Fleet Bank had wired to the account the previous day,

8

against four outstanding loans in the Provident Warehouse Line. Later that day, around 4:30 p.m., Provident received a copy of an <u>in rem</u> foreclosure complaint from the FBI detailing Morningstar's fraud against Provident and Regions.[4] That same afternoon, Provident also received a two-page fax from Fleet Bank regarding the wire transfers for $171,720 and $627,000 to Morningstar's DDA which stated "pls note possible fraud pls rtn as sent in error no indemnity. . . Possible fraud."

On April 17, 2000, Mr. Aldridge telephoned Provident to request the return of the funds that were wired into Morningstar's DDA by Fleet Bank. On April 21, 2000, Mr. Aldridge also sent a formal written demand for repayment of the funds to Provident's in-house counsel. On May 15, 2000, counsel for Provident responded by letter to Regions's demand and refused to return the funds.

Regions filed a complaint in the District Court for the Northern District of Georgia on June 30, 2000, asserting state law claims against Provident for conversion, unjust enrichment, receipt of stolen property, wrongful set-off and violations of Georgia [5] and federal[6] racketeering statutes. Regions also asserted a

---

[4]The <u>in rem</u> complaint alleged that Morningstar obtained loans from Provident and Regions by either pledging no collateral at all, or by pledging collateral that had already been pledged to secure funds from another bank. The complaint also alleges that Morningstar forged closing documents and used the funds it obtained from Provident and Regions to cover its operating expenses rather than to originate loans.

[5]Under Georgia law:
(a) It is unlawful for any person, through a pattern of racketeering activity or

9

number of claims against Morningstar and Ms. Daidone. Pursuant to Rule 55(a)

of the Federal Rules of Civil Procedure, the clerk entered a default judgment

against Morningstar and Ms. Daidone on February 2, 2001, for failure to file an

answer or other pleading in response to the complaint or the first amended

complaint. On May 12, 2001, Regions filed a second amended complaint,

dropping the federal and state racketeering claims against Provident and adding a

claim of wrongful set-off against Provident.[7]

Provident filed a motion for summary judgment on January 7, 2002. On

September 25, 2002, the district court granted Provident's motion for summary

---

proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money.
(b) It is unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

Ga. Code Ann. § 16-14-4 (2002).

[6]Under federal law:
(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c) (2003).

[7]Regions's claims of receipt of stolen property, conversion, unjust enrichment, and wrongful set-off will hereinafter collectively be referred to as the "state law claims." Regions asserted these state law claims against Provident under Ohio law. Provident does not dispute the application of Ohio law to this case. We will therefore determine the issues in accordance with Ohio law.

judgment, holding that each of Regions's state law claims was preempted by Article 4A of the U.C.C. ("Article 4A"). The court also found that "[b]ecause [W&M's] possible fraud notifications arrived after Provident accepted the payment orders, they were ineffective to cancel them." The district court had jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332. Regions has filed a timely appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291.

II

Regions asserts that the district court erred in holding that Regions's state law claims were preempted by Article 4A. Regions argues that "nothing in Article 4A suggest that the drafters intended it to insulate a wrongdoer from liability in connection with funds transfers that were effectuated as intended." Regions asserts that its claims were not preempted because Provident accepted the funds when it knew or should have known that the funds were fraudulently obtained. Regions further contends that "genuine issues of material fact exist with respect to the elements of Regions's claims." This court reviews a district court's grant of summary judgment de novo. Scala v. City of Winter Park, 116 F.3d 1396, 1398 (11th Cir. 1997).

Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Pritchard v. S. Co.

11

Servs., 92 F.3d 1130, 1132 (11th Cir. 1996).  The district court concluded that it was unnecessary to determine whether a genuine issue of material fact existed regarding Regions's state law claims because it held that those claims were preempted by Article 4A.  "We may, however, affirm the grant of summary judgment on any ground fairly supported by the record."  Alliance Metals, Inc., of Atlanta v. Hinely Indus., Inc., 222 F.3d 895, 900 (11th Cir. 2000).

"[P]arties whose conflict arises out of a funds transfer should look first and foremost to Article 4-A for guidance in bringing and resolving their claims . . . ."  Sheerbonnet, Ltd. v. Am. Express Bank, Ltd., 951 F. Supp. 403, 407 (S.D.N.Y. 1995).  Regions's claims are based on Morningstar's direction to Fleet Bank to transfer funds, illegally obtained from Regions, to Morningstar's DDA at Provident.  Because the wire transfers at issue here occurred via the Federal Reserve Wire Transfer Network, or "Fedwire," which is owned and operated by the Federal Reserve Banks, Subpart B of Federal Reserve Regulation J ("Regulation J"), 12 C.F.R. §§ 210.25-210.32, applies.  See id. § 210.25(a) ("This subpart provides rules to govern funds transfers through Fedwire . . . .").  Moreover, Regulation J "incorporates the provisions of Article 4A" of the U.C.C. as set forth in the Regulation, id. § 210.25(b)(1), and "governs the rights and obligations of," inter alia, "parties to a funds transfer any part of which is carried

12

out through Fedwire. . . . " Id. § 210.25(b)(2)(v).  See also Grossman v.

Nationsbank, N.A., 225 F.3d 1228, 1232 (11th Cir. 2000) (per curiam)

("Regulation J applies U.C.C. Article 4A to wire transfers conducted using

Fedwire.").  Accordingly, the provisions of Article 4A, as incorporated to funds

transfers using Fedwire via Regulation J, apply to the circumstances before us.

Section 4A-103 of Article 4A defines various terms that are used within the

Article such as payment order[8], beneficiary[9], beneficiary's bank[10], receiving

bank[11], and sender[12].  Under Article 4A, Provident was the beneficiary's bank and

the receiving bank when it received the payment order from Fleet Bank, the

sender, on behalf of Morningstar, the beneficiary.

The rules that emerged during the drafting of the U.C.C. "are intended to be

---

[8]"Payment order means an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary . . . ."  U.C.C. § 4A-103(a)(1).

[9]"Beneficiary means the person to be paid by the beneficiary's bank."  U.C.C. § 4A-103(a)(2).

[10]"Beneficiary's bank means the bank identified in a payment order in which an account of the beneficiary is to be credited pursuant to the order or which otherwise is to make payment to the beneficiary if the order does not provide for payment to an account."  U.C.C. § 4A-103(a)(3).

[11]"Receiving bank means the bank to which the sender's instruction is addressed."  U.C.C. § 4A-103(a)(4).

[12]"Sender means the person giving the instruction to the receiving bank."  U.C.C. § 4A-103(a)(5).

the exclusive means of determining the rights, duties and liabilities of the affected parties <u>in any situation covered by particular provisions of the Article</u>."  U.C.C. § 4A-102 cmt. (emphasis added).  However, Article 4A is not the "exclusive means by which a plaintiff can seek to redress an alleged harm arising from a funds transfer."  <u>Sheerbonnet</u>, 951 F. Supp. at 409.  <u>See also</u> J.J. White & R.S. Summers, <u>Uniform Commercial Code</u>, §§ 1-2, at 132 (1993 pocket part) ("With the adoption of Article 4A, electronic funds transactions are governed not only by Article 4A, but also common law . . . .").  "The Article itself is replete with references to common law remedies." <u>Sheerbonnet</u>, 951 F. Supp. at 408.  "[T]he Drafting Committee intended that Article 4A would be supplemented, enhanced, and in some places, superceded by other bodies of law . . . the Article is intended to synergize with other legal doctrines."  T.C. Baxter & R. Bhala, <u>The Interrelationship of Article 4A with Other Law</u>, 45 Business Lawyer 1485, 1485 (1990).  "The legislative intent reflected here is that carefully drafted provisions . . . are not to be side-stepped when convenient by reference to other sources of law.  But where the provisions do not venture, the claimant need not turn back; he or she may seek other guides, statutory or judicial."  <u>Sheerbonnet</u>, 951 F. Supp. at 408.  Therefore, the only restraint on a plaintiff is that "resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and

liabilities <u>inconsistent</u> with those stated in this Article." U.C.C. § 4A-102 cmt. (emphasis added).

The parties do not dispute that Provident complied with the relevant provisions of the U.C.C. in accepting the transfer[13] and setting off the funds[14] to credit the debt owed to Provident by Morningstar. Regions argues that the "[p]rovisions of Article 4A deal with allocation of risk and responsibility" with regards to claims based on mistake and error and that "[n]othing in Article 4A suggests that the drafters intended it to insulate a wrongdoer from liability in connection with funds transfers that were effectuated as intended." Provident asserts that the text of Article 4A and the official commentary do not suggest that

---

[13]Section 4A-209 governs acceptance of a payment order and reads in pertinent part:
(a) Subject to subsection (d), a receiving bank other than the beneficiary's bank accepts a payment order when it executes the order.
(b) Subject to subsections (c) and (d), a beneficiary's bank accepts a payment order at the earliest of the following times:
(1) when the bank (i) pays the beneficiary as stated in Section 4A-405(a) or 4A-405(b), or (ii) notifies the beneficiary of receipt of the order or that the account of the beneficiary has been credited with respect to the order unless the notice indicates that the bank is rejecting the order or that funds with respect to the order may not be withdrawn or used until receipt of payment from the sender of the order;
(2) when the bank receives payment of the entire amount of the sender's order pursuant to Section 4A-403(a)(1) or 4A-403(a)(2).

[14]Section 4A-502 governs set off by a beneficiary's bank and reads in pertinent part:
(c) If a beneficiary's bank has received a payment order for payment to the beneficiary's account in the bank, the following rules apply:
(1) The bank may credit the beneficiary's account. The amount credited may be set off against an obligation owed by the beneficiary to the bank or may be applied to satisfy creditor process served on the bank with respect to the account.

15

Article 4A is limited to claims based on mistake and errors.

Article 4A is silent with regard to claims based on the theory that the beneficiary bank accepted funds when it knew or should have known that the funds were fraudulently obtained. Therefore, a provision of state law that requires a receiving or beneficiary bank to disgorge funds that it knew or should have known were obtained illegally when it accepted a wire transfer is not inconsistent with the goals or provisions of Article 4A. The U.C.C. supports this conclusion. Article 4A defines good faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing." U.C.C. § 4A-105(6). The U.C.C. also provides that "[e]very contract or duty within [the U.C.C.] imposes an obligation of good faith in its performance or enforcement." Id. § 1-203. Furthermore, we are mindful that the Supreme Court has repeatedly held that "[i]f possible, [a court] should avoid construing [a] statute in a way that produces [] absurd results." Dewsnup v. Timm, 502 U.S. 410, 427 (1992). See also United States v. Granderson, 511 U.S. 39, 47 n.5 (1994) (refusing to apply a "plain meaning" interpretation of a sentencing proviso when such an interpretation "leads to an absurd result"). Interpreting Article 4A in a manner that would allow a beneficiary bank to accept funds when it knows or should know that they were fraudulently obtained, would allow banks to use Article 4A as a shield for

16

fraudulent activity. It could hardly have been the intent of the drafters to enable a party to succeed in engaging in fraudulent activity, so long as it complied with the provisions of Article 4A.

Regions argues that it presented sufficient facts to demonstrate that there is a genuine issue of fact in dispute regarding whether Provident knew or should have known that the funds it received by Morningstar were obtained by fraud. Regions bases its state law claims on the fundamental principle of property law that "no one can obtain title to stolen property[,] . . . however innocent [a buyer] may have been in the purchase; public policy forbids the acquisition of title through the thief." Pate v. Elliott, 400 N.E.2d 910, 912 (Ohio Ct. App. 1978) (per curiam) (quoting Ogden v. Ogden, 4 Ohio St. 182, 195 (1854)). This rule applies to the theft of goods or chattels but does not apply to the transfer of money. In Ohio, "[t]he general rule, as evidenced by the great weight of authority, is that only bad faith on the part of a third person receiving stolen money, or his failure to pay valuable consideration therefor, will defeat his title thereto as against the true owner." Hinkle v. Cornwell Quality Tool Co., 532 N.E.2d 772, 777 (Ohio App. 1987). See also Newpower v. Boyd, 233 F.3d 922, 930 (6th Cir. 2000) (explaining that if an embezzler purchases an item from a good faith seller with stolen funds, the seller "obtains good title to the money the thief provides");

Ogden, 4 Ohio St. at 195 (stating that one can not take title from a thief, "money and bank notes possibly excepted").  Had Provident known or had reason to know that the funds it received from Morningstar were obtained by fraud, it could not have obtained title to the funds upon acceptance of the wire transfer from Fleet Bank because it would have acted in bad faith.[15]

Regions claims, inter alia, that Provident is civilly liable for receiving property stolen from Regions.  Under Ohio law, "[a]nyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law."  Ohio Rev. Code Ann. § 2307.60 (West 2003).  It is a criminal act to "receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense."  Id. § 2913.51 (emphasis added).  Exertion of control of the property or services of another "[b]eyond the scope of the express or implied consent of the owner or person authorized to give consent," or "[b]y deception" is a theft offense under Ohio law.  Id. § 2913.02.

A beneficiary bank accepts a payment order when the "bank receives payment of the entire amount of the sender's order."  U.C.C. § 4A-209(b)(2)

---

[15]Provident urges this court to require only actual knowledge of fraudulent activity, but cites to no authority supporting this definition of good faith.

18

(2003). Provident accepted payment orders from Fleet Bank and deposited the funds into the DDA held by Morningstar at Provident, on April 11 and 13, 2000. Title to funds in a wire transfer passes to the beneficiary bank upon acceptance of a payment order. See United States v. BCCI Holdings (Luxembourg), S.A., 980 F. Supp. 21, 27 (D.D.C. 1997) ("Because an accepted transfer cannot be revoked without the consent of the beneficiary, and the beneficiary bank incurs an obligation to the beneficiary upon acceptance of the funds, the ownership interest in those funds must pass from the originator upon completion of the funds transfer.") (quotation marks and citations omitted). See also United States v. BCCI Holdings (Luxembourg), S.A., et al. (In re Petition of Pacific Bank), 956 F. Supp. 5, 11 (D.D.C.1997) (same); Official Comment of U.C.C. § 4A-102 (explaining that in the drafting of Article 4A, substantial consideration was given to policy goals of assigning responsibility, allocating risks, and predicting risk with certainty in electronic fund wire transactions). If Provident received the payment order without "knowing or having reasonable cause to believe that the property [had] been obtained through commission of a theft offense," Ohio Rev. Code Ann. § 2913.51, title to the funds lawfully passed to Provident on April 11 and 13, 2000, upon its acceptance of the payment orders on behalf of Morningstar's DDA.

19

Regions conceded during oral argument that the phone call from Ms. Robison of Fleet Bank on April 13, 2000 at 5:42 p.m. to an employee at a suburban Cincinnati branch of Provident Bank, "was indeed the first direct statement from someone to Provident Bank that the particular wires at issue were potentially fraudulent or the product of criminal activity." However, this phone call occurred <u>after</u> both payment orders were received by Provident on behalf of Morningstar's DDA.[16] To state a valid claim requiring disgorgement of the funds wired to Provident, Regions was required to demonstrate that Provident knew or had reasonable cause to believe that it was receiving fraudulently obtained funds <u>before</u> it received the wire transfers and acquired title to the funds.

Regions contends that there were a number of "red flags" raised by Morningstar's conduct before 5:42 p.m. on April 13, 2000, which gave notice to Provident that the funds coming into Morningstar's account were the product of fraudulent or criminal activity. Regions notes that Provident knew that Morningstar failed to make prompt payments on the loans from the Provident Warehouse Line or to sell the outstanding loans to investors within the time periods required by the loan agreements. The fact that Morningstar frequently

_____

[16]The April 13, 2000 payment order was received by Provident on behalf of Morningstar's DDA the same date as the 5:42 p.m. phone call. However, Regions has not adduced any evidence that the phone call was made before Provident accepted the payment order.

20

missed the deadlines imposed by Provident shows that Morningstar engaged in poor business or accounting practices, but not fraud. Provident's awareness that the FBI was investigating whether Morningstar had forged Mr. Jiras's signature on loan closing documents submitted to Provident does not demonstrate that the money subsequently paid by Morningstar to Provident to repay the loans was obtained by fraud.

The record shows that Provident knew that Morningstar used the same collateral to obtain funding from both Provident and First Union. This knowledge was not sufficient to put Provident on notice that the money it received was obtained by fraud. These so-called "red flags" were sufficient to demonstrate to Provident that Morningstar was an inept business entity with questionable ethical standards which prompted Provident to demand payment of all outstanding loans made to Morningstar. None of these facts is evidence that the wire transfers transmitted by Fleet Bank were obtained by fraud.

The record shows that Morningstar informed Provident that it planned to liquidate certain of its assets in order to pay off its debt. Regions has not demonstrated that Provident knew or should have known that Morningstar did not possess sufficient assets to cover its business losses.

Both payment orders sent by Fleet Bank to Morningstar's DDA identified

21

Morningstar's account number at Provident and "Morningstar Real Estate & Mortgage Financing Corp." as the beneficiary of the funds. The payment order from April 12, 2000, also contained a line stating "Orig to BNF info: Re: Aguado–Morningstar Mortgage Bankers, Inc." The payment order from April 13, 2000, contained a line stating that "Orig to BNF info: Re Graziosi $162,000 Crawford $465,000." Regions contends that because Aguado, Crawford and Graziosi were not individuals who had received loans from the Provident Warehouse line, the fact that their names were mentioned on the payment orders from Fleet Bank to Provident was sufficient to put Provident on notice that the funds it was accepting had originated with the intent of funding loans separate from the Provident Warehouse Line. However, "[w]hen a transfer order identifies the beneficiary by an account number, the receiving bank may rely on the account number in crediting the account even though the transfer order identifies a person different from the holder of the account," Eisenberg, 301 F.3d at 223, "if the Federal Reserve Bank does not know of such an inconsistency in identification," 12 C.F.R. § 210.27. See also Eisenberg, 301 F.3d at 223 (holding that a defendant was not liable for violating the U.C.C. when the defendant relied on the account number stated on the payment order to credit the account, instead of the name designated by the wire instructions). "A Federal Reserve Bank has no duty to

22

detect any such inconsistency in identification [of an account holder]." 12 C.F.R. § 210.27.

Here, the payment order accurately identified Morningstar as the holder of the account. The payment orders contained only a cryptic reference to the names Aguado, Crawford and Graziosi. The payment orders did not state that Regions had provided the funds to W&M to loan to these individuals. Regions has failed to cite any authority for the proposition that a beneficiary's bank must conduct an investigation into names that appear on a payment order where the holder of the account is correctly identified. The fact that the names Aguado, Crawford and Graziosi appeared on the payment orders from Fleet Bank to Provident is insufficient evidence to conclude that Provident knew or should have known that the funds were obtained illegally. Martin J. Weiss, Warehouse Operations Manager for Provident's Warehouse Funding Division testified at his deposition that "when someone from the warehouse division were [sic] looking at a DDA account . . . one reviewing the account . . . would only see debits and credits, deposits and withdrawals" and one would not be able to "determine the method by which the money showed up in the DDA account."

Because the "red flags" identified by Regions are insufficient as a matter of law to prove that Provident "[knew] or [had] reasonable cause to believe that the

23

[funds had] been obtained through commission of a theft offense," Ohio Rev. Code Ann. § 2913.51, Provident would not be liable for receiving stolen property under Ohio law.

Regions also asserted claims of conversion,[17] unjust enrichment,[18] and unlawful set-off[19] against Provident. Since one acting in good faith may obtain title to money from a thief, Hinkle, 532 N.E.2d at 777, Provident obtained legal title to the funds when it accepted the wire transfers from Fleet Bank on April 11 and 13, 2000. Following Provident's acceptance of the funds transferred by Fleet Bank, Regions no longer had title to those funds. See Shawmut Worcester County Bank v. First Am. Bank & Trust, 731 F. Supp. 57, 60 (D. Mass. 1990) (holding that the completion of a wire transfer extinguishes the originator's ownership

---

[17]"[C]onversion is the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." Joyce v. Gen. Motors Corp., 551 N.E.2d 172, 175 (Ohio 1990).

[18]Under Ohio law, a defendant may be liable for unjust enrichment when (1) the plaintiff has conferred a benefit on the defendant, and (2) the plaintiff has such superior equity under the circumstances that it would be unconscionable for the defendant to retain the benefit. Cincinnati v. Fox, 49 N.E.2d 69, 73 (Ohio Ct. App. 1943).

[19]The law of set-off in Ohio is that "[a] Bank, even though it has no knowledge, either express or implied, that another than the depositor has an interest in the funds deposited in his own name, cannot apply such funds to the individual indebtedness to it of the depositor, where such lack of knowledge has not resulted in any change in the Bank's position and no superior equities have been raised in its favor." Federal Ins. Co. v. Fifth Third Bank, 867 F.2d 330, 335 (6th Cir. 1989) (quoting Kull v. North High Sav. & Loan Co., 21 Ohio Law Abs. 172, 176 (Ohio Ct. App. 1935) (citation omitted)).

interest in the funds). When Provident debited Morningstar's account and credited the warehouse line on April 12 and 14, 2000, Provident's possessory interest in the funds was superior to Regions's. Because Regions has not demonstrated that Provident acted in bad faith, Regions has failed to prove an essential element of each of its state law claims.

## CONCLUSION

We agree with Regions's assertion that Article 4A does not preempt a state law claim if money is transferred by wire to a party that knows or should have known that the funds were obtained illegally. Nonetheless, we are persuaded from our independent review of the record that Regions has failed to present evidence demonstrating that there is a genuine issue of fact regarding whether Provident knew or should have known that the funds it received from Morningstar had been fraudulently obtained. Such proof was necessary to support a judgment on each of Regions's state law claims. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (stating that there can be "no genuine issue as to any material fact," when the non-moving party has failed to prove an essential element of its case) (quotation marks omitted); Johnson v. Bd. of Regents of Univ. of Ga., 263 F.3d 1234, 1243 (11th Cir. 2001) (stating that summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an

25

element essential to that party's case, and on which that party will bear the burden of proof at trial") (quotation marks and citation omitted).  The district court's decision to grant Provident's motion for summary judgment is AFFIRMED.