In the

# United States Court of Appeals
## For the Seventh Circuit

No. 22-3163

APPROVED MORTGAGE CORPORATION,

*Plaintiff-Appellant,*

*v.*

TRUIST BANK, formerly known as SUNTRUST BANK,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:22-cv-00633 — **Jane Magnus-Stinson**, *Judge.*

ARGUED SEPTEMBER 20, 2023 — DECIDED JUNE 28, 2024

Before RIPPLE, JACKSON-AKIWUMI, and LEE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Before Approved Mortgage Corporation ("Approved Mortgage") could initiate two wire transfers, the instructions for the transactions were altered surreptitiously by a third party. Truist Bank ("Truist"), formerly known as SunTrust Bank, ultimately received the transfers, deposited the funds into an account it previously had flagged as suspicious, and then allowed the withdrawal of a half-million dollars in cashier's checks from that account.

With the funds unrecoverable, Approved Mortgage brought this action against Truist, seeking damages in the amount of the transfers. Approved Mortgage asserted two claims under Section 207 of Article 4.1 of the Indiana Uniform Commercial Code ("UCC"), which governs the rights, duties, and liabilities of banks and their customers with respect to electronic funds transfers. It also asserted a common law negligence claim. The district court dismissed the Section 207 claims for lack of privity between Approved Mortgage and Truist. The court dismissed the negligence claim as preempted by Article 4.1.[1]

Approved Mortgage's Section 207 claims were properly dismissed. Section 207 does not establish an independent remedy. It must be read with Section 402 and, under Section 402, a sender is entitled to a refund only from the bank which received its payment. The district court erred, however, in its dismissal of Approved Mortgage's negligence claim. To the extent that the negligence claim arises from Truist's issuance of the cashier's checks after Truist credited the funds to the suspicious account, the claim is not preempted by Article 4.1.

We therefore affirm in part and reverse in part the judgment of the district court. The case is remanded to the district court for further proceedings consistent with this opinion.

---

[1] The jurisdiction of the district court is predicated on its diversity jurisdiction. *See* 28 U.S.C. § 1332.

# I

# BACKGROUND

## A.

Because this case comes to us from the district court's grant of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, we present the facts as alleged in Approved Mortgage's amended complaint.

Approved Mortgage is a mortgage originator that provides loans to residential and commercial customers. In the summer of 2021, Approved Mortgage received payoff requests from two of its customers. These customers directed, in both situations, that the payments be made to Huntington Mortgage Company ("Huntington"). Before Approved Mortgage acted on these requests, however, the instructions for both payoffs were altered by unknown perpetrators who had accessed illegally Approved Mortgage's system. These hackers had modified the wire instructions to substitute SunTrust Bank, Truist's former name, as the beneficiary instead of Huntington.

Approved Mortgage therefore unwittingly provided these altered wire instructions to MVP National Title Company ("MVP Title") when it sought to fulfill the payoff requests. MVP Title then initiated funds transfers by sending payment orders with the altered wire instructions to its bank, BankUnited.

Following these instructions, BankUnited sent payment orders to Truist in the amount of $217,108.33 on July 30, 2021, and in the amount of $333,536.65 on August 4, 2021. Truist accepted the transfers and applied the funds to an account at Truist matching the account number on the altered wire

instructions. This account, which belonged to AER Operations, LLC ("AER Operations"), did not match the other information provided in these instructions. The instructions identified Truist, not AER Operations, as the transfer's beneficiary. The AER Operations account listed an address in Tillamook, Oregon, rather than the Columbus, Ohio, address given in the instructions.

This situation was not the first sign of suspicious activity connected to the AER Operations account. Less than two weeks earlier, on July 22, 2021, Truist had stopped a wire transfer of $116,306.51 intended for the same account on suspicion of fraud or other irregularity.

On August 9, 2021,[2] Arthur Rubiera, AER Operations's registered agent, traveled from his home in Oregon to a Memphis, Arkansas, branch of Truist. Despite Truist's past concerns with the AER Operations account and the other indicia of suspicious activity, Truist employees provided Rubiera with $546,658 in cashier's checks drawn from the AER Operations account. Rubiera then distributed the cashier's checks to other parties who converted the funds into cryptocurrency.

Because the wired funds never reached Huntington, Approved Mortgage paid off the two customers' mortgages with its own funds. MVP Title, the originator of the funds transfers, assigned to Approved Mortgage any claims it might have against Truist.

---

[2] The amended complaint presents this date as August 9, 2020, but, as the district court recognized, given the other dates provided in the complaint, this is clearly scrivener's error. *Approved Mortg. Corp. v. Truist Bank*, 638 F. Supp. 3d 941, 944 n.2 (S.D. Ind. 2022). Approved Mortgage uses the August 9, 2021, date in its briefing.

**B.**

In 2022, Approved Mortgage brought this action against Truist in Indiana state court. Truist subsequently removed the case to the United States District Court for the Southern District of Indiana, asserting diversity of citizenship.

Once in federal court, Approved Mortgage filed an amended complaint bringing three distinct claims. The first two of these claims were brought under Article 4.1 of the Indiana UCC, Indiana's adoption of Article 4A of the UCC. The first claim alleged that Truist had violated Indiana Code § 26-1-4.1-207(a) by accepting payment orders which referred to a nonexistent or unidentifiable account. The second claim alleged that Truist violated Indiana Code § 26-1-4.1-207(b)(2) by accepting the payment orders despite knowing that the beneficiary's name and beneficiary's account number identified different persons. In both, Approved Mortgage asserted that, either in its own capacity or as MVP Title's assignee, it was entitled to a refund of the misapplied funds under Indiana Code § 26-1-4.1-402(d) and that Approved Mortgage suffered damages as a result of the transfers.

Approved Mortgage's third claim alleged common law negligence. Approved Mortgage alleged that Truist breached its duty to act with ordinary care, to use sound banking practices, and to act in a commercially reasonable manner when it failed to flag the AER Operations account as suspicious before the funds transfers occurred and when it allowed Rubiera to withdraw the funds from the account despite the indicia of suspicious activity.

In its Rule 12(b)(6) motion to dismiss this amended complaint, Truist submitted that both Section 207 claims failed

because neither Approved Mortgage nor MVP Title were in privity with Truist. It further contended that Approved Mortgage's negligence claim could not proceed because it was preempted by Article 4.1 and alternatively that Truist owed Approved Mortgage no duty of care under Indiana law.

The district court granted Truist's motion to dismiss all three of Approved Mortgage's claims with prejudice. The district court determined that privity was required for Approved Mortgage's Section 207 claims. It reasoned that Section 207 identifies circumstances in which the acceptance of a funds transfer cannot occur. It also noted, however, that Section 207 does not provide a remedy when funds are nevertheless transferred despite the strictures of Section 207. Approved Mortgage therefore must look to the refund provision of Section 402(d) for its remedy. Then, relying on both the plain language of Section 402(d) and the reasoning of the Court of Appeals for the Second Circuit in *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97 (2d Cir. 1998), the district court determined that Section 402(d) only obligates a receiving bank to refund the sender from which it received the payment. Applying this privity requirement, the district court concluded that Approved Mortgage, as MVP Title's assignee, had no valid Section 402(d) refund remedy (and therefore no Section 207 claims) against Truist; BankUnited, not Truist, was the receiving bank of the payment orders sent by MVP Title.

Finally, the district court concluded that the negligence claim was preempted because "the harm of which Approved Mortgage complains is in reality a direct result of Truist's acceptance of the wire transfers and the resulting payment of funds to AER Operations," and the "acceptance of wire transfers and liability for losses associated with wire transfers is

expressly addressed in the UCC." *Approved Mortg. Corp. v. Truist Bank*, 638 F. Supp. 3d 941, 953 (S.D. Ind. 2022). The district court did not address whether Truist owed Approved Mortgage a duty of care under Indiana law. Approved Mortgage timely appealed.

## II

## DISCUSSION

We review the grant of a Rule 12(b)(6) motion to dismiss de novo, accepting as true the complaint's well-pleaded allegations and drawing all reasonable inferences in the plaintiff's favor. *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019).

Approved Mortgage submits that the district court erred in holding that its Section 207 claims required privity. It also contends that its common law negligence claim is not preempted by Article 4.1.

Our "primary goal" when interpreting an Indiana statute "is to determine and follow the legislature's intent." *Lake Imaging, LLC v. Franciscan All., Inc.*, 182 N.E.3d 203, 207 (Ind. 2022). "The best evidence of this intent is the statutory language itself, which, when given its plain and ordinary meaning, should apply 'in a logical manner consistent with the statute's underlying policy and goals.'" *Id.* (quoting *Cubel v. Cubel*, 876 N.E.2d 1117, 1120 (Ind. 2007)). We look to the statute "as a whole, avoiding 'interpretations that depend on selective reading of individual words that lead to irrational and disharmonizing results.'" *Id.* (quoting *ESPN, Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1195 (Ind. 2016)). We interpret words not otherwise defined as taking "their

common and ordinary meanings." *Porter Dev., LLC v. First Nat'l Bank of Valparaiso*, 866 N.E.2d 775, 778 (Ind. 2007).

When the Indiana legislature adopts a UCC provision, Indiana courts consider the official UCC commentary expressing the intent of its drafters as indicative of legislative intent, even when the comments themselves have not been adopted explicitly by the legislature. *See Kenworth of Indianapolis, Inc. v. Seventy-Seven Ltd.*, 134 N.E.3d 370, 382 (Ind. 2019); *EngineAir, Inc. v. Centra Credit Union*, 107 N.E.3d 1061, 1066–67 (Ind. Ct. App. 2018). We also consider, as persuasive authority, other courts' interpretations of Article 4A provisions. *See Insul-Mark Midwest, Inc. v. Mod. Materials, Inc.*, 612 N.E.2d 550, 556 (Ind. 1993); *United Bank of Crete-Steger v. Gainer Bank, N.A.*, 874 F.2d 475, 478 n.5 (7th Cir. 1989) ("In order to promote the objective of uniformity stated in § 1–102 of the Uniform Commercial Code, it is appropriate, if not mandated, that a court refer to decisions of other jurisdictions interpreting the same provision.") (applying Indiana law).

## A.

We turn first to Approved Mortgage's submission with respect to Section 207. The two funds transfers at issue in this case each involved two payment orders.[3] In both transactions,

---

[3] Article 4.1 defines a payment order as "an instruction of a sender to a receiving bank." Ind. Code § 26-1-4.1-103(a)(1). A funds transfer is a "series of transactions" beginning with the originator's payment order "made for the purpose of making payment to the beneficiary of the order." § 26-1-4.1-104(a). This originator is the "sender of the first payment order in a funds transfer," § 26-1-4.1-104(c), but each subsequent payment order within the funds transfer has its own sender. § 26-1-4.1-103(a)(5). "A funds transfer is completed by acceptance by the beneficiary's bank of a payment ( … continued)

the originator, MVP Title, sent the first payment order to its bank, BankUnited. Then BankUnited sent the second payment order to the beneficiary's bank, Truist. Approved Mortgage maintains that Truist was prohibited under Section 207 of Article 4.1 from accepting the payment order.

The district court concluded that privity was required for Approved Mortgage's Section 207 claims. Its analysis was two-pronged: a claim alleging that acceptance was barred under Section 207 must look to Section 402 for its remedy; and, under Section 402(d), a sender is only entitled to a refund from its receiving bank. Approved Mortgage disputes both prongs of this analysis on appeal. We agree with the district court's approach.

Section 207 identifies conditions under which "acceptance of the [payment] order" by a beneficiary's bank "cannot occur." Ind. Code § 26-1-4.1-207. Subsection (a) prohibits acceptance "if, in a payment order received by the beneficiary's bank, the name, bank account number, or other identification of the beneficiary refers to a nonexistent or unidentifiable person or account." § 26-1-4.1-207(a). Subsection (b) prohibits acceptance if the beneficiary's bank knows that the payment order identifies the beneficiary by a name and bank account number belonging to different persons. § 26-1-4.1-207(b). Of great importance to this case, Section 207 does not state what happens when funds are received by the beneficiary's bank

---

order for the benefit of the beneficiary of the originator's payment order." § 26-1-4.1-104(a). "For any given funds transfer, there can be only one originator, originator's bank, beneficiary, and beneficiary's bank, but there can be several senders and receiving banks, one of each for every payment order required to complete the funds transfer." *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 100 (2d Cir. 1998).

despite the prohibition on acceptance. The statutory language states that acceptance "cannot occur," but does not explain the effect of the non-occurrence.

Section 402 provides this answer. It describes how the failure to complete a funds transfer through acceptance by the beneficiary's bank affects the payment obligations of the various parties to the transfer. Under subsection (c), each sender's obligation to pay its payment order to its receiving bank "is excused if the funds transfer is not completed by acceptance by the beneficiary's bank of a payment order instructing payment to the beneficiary of that sender's payment order." § 26-1-4.1-402(c). If a sender already made payments in the noncompleted funds transfer, it is entitled to a refund of that payment under subsection (d). Section 402 thus provides a remedy by which senders are made whole when the beneficiary's bank's acceptance of a payment order could not have occurred.[4] The UCC commentary refers to this arrangement as a "money-back guarantee." UCC § 4-A-402, cmt. 2.

Approved Mortgage contends that Section 207 creates causes of action distinct and independent from a Section 402(d) refund action.[5] We cannot accept this view. The plain text of Section 207 does not expressly reference Section 402. But, as we already have noted, Section 207 also does not itself provide the consequences when acceptance cannot occur. It

---

[4] "[T]he noncompletion of a funds transfer … releases each sender from its payment obligation to the respective receiving bank, or entitles such a sender to a refund of payment already made." 1 *The Law of Electronic Funds Transfers* § 2.04 (2022).

[5] We note that this position is at odds with Approved Mortgage's amended complaint, which invokes the Section 402(d) refund obligation in asserting both Section 207 claims. R.19 at ¶¶ 29, 35.

must be read within the context of Article 4.1's statutory framework, and, within that framework, Section 402 explains those consequences.[6]

Section 207's commentary conveys clearly that its drafters intended for banks to look to Section 402 when acceptance could not occur. This commentary states that non-acceptance under Section 207 excuses senders' payment obligations under Section 402(b) and (c). The first comment explains that when acceptance cannot occur under Section 207(a) because the beneficiary of a funds transfer is nonexistent or unidentifiable, each sender in the funds transfer is not obliged under Section 402(c) to pay its order and "each sender in the funds transfer that has paid its payment order is entitled to get its money back." UCC § 4-A-207, cmt. 1. The second comment applies Section 402 to a scenario in which the beneficiary's bank knew about a conflict between the beneficiary's name and account number, but still received the funds from the originator's bank and credited them to the account number. Because the beneficiary's bank's acceptance could not occur under Section 207(b), the originator's bank is not obliged under Section 402(b) to pay these funds to the beneficiary's bank;

---

[6] Most district courts that have addressed this issue have reached the same conclusion. *See Imperium Logistics, LLC v. Truist Fin. Corp.*, 686 F. Supp. 3d 600, 605 (E.D. Mich. 2023); *Scura, Wigfield, Heyer, Stevens & Cammarota, LLP v. Citibank, N.A.*, No. 21-CV-12835, 2022 WL 16706948, at *3 (D.N.J. Oct. 3, 2022); *Wellton Int'l Express v. Bank of China (Hong Kong)*, 612 F. Supp. 3d 358, 364 (S.D.N.Y. 2020); *Simple Helix, LLC v. Relus Techs., LLC*, 493 F. Supp. 3d 1087, 1101–02 (N.D. Ala. 2020); *Frankel-Ross v. Congregation OHR Hatalmud*, No. 15-CIV-6566, 2016 WL 4939074, at *3 (S.D.N.Y. Sept. 12, 2016). *But see Wheels Invs., LLC v. Wells Fargo Bank, N.A.*, No. 6:19-CV-658, 2021 WL 8895130, at *3 (M.D. Fla. Apr. 29, 2021) (declining to apply Section 402's privity requirement to a claim brought under Section 207).

the originator is excused under Section 402(c) from its obligation to pay the originator's bank; and the beneficiary's bank "takes the loss." UCC § 4-A-207, cmt. 2. Although Section 402(d) is not cited expressly in these comments, because Section 402(c)'s relief from the obligation to pay is triggered by Section 207, Section 402(d)'s refund of the non-obliged payments must be as well. Section 402(d) is the means by which parties receive their "money back" for non-obliged payments already made.[7]

Next, Approved Mortgage submits that Section 402(d) itself does not impose a privity requirement. It contends that the district court erred in finding the plain language of Section 402(d) to support a privity requirement and by applying *Grain Traders* to this case. Approved Mortgage challenges the privity requirement as "impracticable and unworkable" because it would require an action against BankUnited in the absence of wrongdoing on BankUnited's part.[8] We address each of these arguments in turn.

First, even though Section 402(d) does not use the word privity, its plain language tethers the refund obligation to the payment order, not a funds transfer generally:

> If the sender of a payment order pays the order and was not obliged to pay all or part of the amount paid, the bank receiving payment is

---

[7] 5 Frederick H. Miller & Alaina Gimbert, *Hawkland UCC Series* § 4A-207:2 (2024) ("[I]n any of the circumstances enumerated in U.C.C. § 4A-207, the determination that no person has any rights or obligations in the payment order implicates the full panoply of U.C.C. Article 4A provisions which effectuate the money-back guarantee.").

[8] Appellant's Opening Br. 32.

> obliged to refund payment to the extent the
> sender was not obliged to pay.

Ind. Code § 26-1-4.1-402(d). The use of definite articles ("the sender" and "the bank receiving payment") limit its scope to the parties to that payment order. Nothing in its text expands the refund obligation beyond the payment order to the broader funds transfer.

Second, the Second Circuit's reasoning in *Grain Traders* is persuasive, and we see no merit in Approved Mortgage's attempt to limit its holding to intermediary banks.[9] *Grain Traders* did concern a refund sought from an intermediary bank and, given this context, the Second Circuit discussed the burdens that the lack of a privity requirement would place on intermediary banks. *Grain Traders* essentially interpreted the text of Section 402(d) and that text makes no distinction between different types of receiving banks. The Second Circuit held that Section 402 "imposes a privity requirement such that a sender seeking a refund for an uncompleted funds transfer may look only to the receiving bank to whom it issued a payment order and payment." *Grain Traders*, 160 F.3d at 106. The Second Circuit noted that the UCC comments identified the money-back guarantee as "particularly important" to the originator of the funds transfer when the incompletion is due to the fault of an intermediary bank rather than the originator's bank. *Id.* at 101 (quoting UCC § 4-A-402,

---

[9] The term "intermediary bank" refers to any receiving bank in a funds transfer that is not the originator's bank or the beneficiary bank. Ind. Code § 26-1-4.1-104(b). In *Grain Traders*, the originator of a funds transfer sought a refund under Section 402(d) from an intermediary bank when the transfer was not completed. 160 F.3d at 99. The court held that the originator could only look to its bank for a refund. *Id.* at 106.

cmt. 2). In this scenario, the originator's bank must refund payment to the originator and then bear "the burden of obtaining [a] refund from the intermediary bank that it paid." *Id.* (quoting UCC § 4-A-402, cmt. 2). The Second Circuit reasoned that the drafters of Article 4A intended "to effect an orderly unraveling of a funds transfer in the event that the transfer was not completed, and accomplished this by incorporating a 'privity' requirement into the 'money back guarantee' provision so that it applies only between the parties to a particular payment order and not to the parties to the funds transfer as a whole." *Id.* The text of Section 402(d) makes no distinction between originator's banks, intermediary banks, and beneficiary's banks.

In contending that a privity requirement cannot exist because it would require actions be brought against "innocent" banks, and thus insulate "wrongdoer" banks from liability, Approved Mortgage misapprehends Section 402. The money-back guarantee is triggered by the failure to complete a funds transfer. The identity of the party at fault for that failure is not relevant to the remedial scheme. The orderly unraveling does impose a burden on "innocent" banks. A receiving bank must refund its sender, even if it will not receive a refund from its receiving bank. *See* UCC § 4A-402, cmt. 2. The imposition of this burden was a conscious choice of Article 4A's drafters. In adopting the Article 4A framework, the Indiana legislature adopted that choice.

This conclusion that Article 4A's drafters intended to impose a privity requirement is consistent with the stated purposes of Article 4A. The privity requirement advances the UCC drafters' goal of promoting "certainty and finality so that 'the various parties to funds transfers [will] be able to

predict risk with certainty'" and make decisions based on these known risks. *Grain Traders*, 160 F.3d at 102 (quoting UCC § 4-A-102, cmt.). "To allow a party to, in effect, skip over the bank with which it dealt directly, and go to the next bank in the chain would result in uncertainty as to rights and liabilities," and "create a risk of multiple or inconsistent liabilities." *Id.* at 102.[10]

At bottom, Article 4.1 provides a framework for facilitating complicated transactions between sophisticated parties with competing interests. This framework requires that incomplete funds transfers be orderly unwound payment order by payment order. If acceptance could not occur under Section 207, BankUnited, not Truist, had the obligation to refund MVP Title, and Truist was only obligated to refund BankUnited. Because Section 402(d) could only entitle Approved Mortgage, as MVP Title's assignee, to a refund from BankUnited, the district court properly dismissed both of Approved Mortgage's Section 207 claims.

---

[10] Crafting Article 4A required weighing the competing interests of "the banks that provide funds transfer services and the commercial and financial organizations that use the services." UCC § 4-A-101, cmt. Section 402's money-back guarantee can be understood as a compromise between those competing interests. The creation of this "form of vicarious liability" for banks which could render them responsible for the insolvency of other banks was "the quid pro quo offered by the banking community in return for the general rule that consequential damages are not recoverable for execution errors." Thomas C. Baxter, Jr. & Raj Bhala, *Proper and Improper Execution of Payment Orders*, 45 Bus. Law. 1447, 1463 (1990). *See also* Carl Felsenfeld, *Strange Bedfellows for Electronic Funds Transfers: Proposed Article 4A of the Uniform Commercial Code and the UNCITRAL Model Law*, 42 Ala. L. Rev. 723, 749–50 (1991).

**B.**

We next turn to the question of whether Approved Mortgage's common law negligence claim is preempted in whole or in part by Article 4A. Because Article 4A's drafters intended for it to be "the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by" its provisions, no party may "resort to principles of law or equity outside of Article 4A … to create rights, duties and liabilities inconsistent with" its provisions. UCC § 4-A-102, cmt.; *see Grain Traders*, 160 F.3d at 103.

In considering whether Approved Mortgage's claim was preempted, the district court quoted at length from its discussion of Article 4A preemption in *BMO Harris Bank N.A. v. Salin Bank & Trust Co.*, 442 F. Supp. 3d 1075 (S.D. Ind. 2020). In *BMO Harris*, the court framed the inquiry as dependent on whether the conduct or factual scenario was "addressed squarely by the provisions of Article 4A." *Id.* at 1081 (quoting *Consorcio Indus. de Construccion Titanes, S.A. de C.V. v. Wells Fargo Bank, N.A.*, No. 3:10-CV-2111, 2012 WL 13019678, at *3 (N.D. Tex. July 12, 2012)). The district court concluded in the case now before us that Approved Mortgage's negligence claim was preempted because "the harm of which Approved Mortgage complains is in reality a direct result" of actions addressed in Article 4.1: "Truist's acceptance of the wire transfers and the resulting payment of funds to AER Operations." *Approved Mortg.*, 638 F. Supp. 3d at 953.

We cannot accept this "direct result" reasoning. "Article 4A embodies an intent to restrain common law claims only to the extent that they create rights, duties, and liabilities *inconsistent* with Article 4A." *Patco Constr. Co. v. People's United Bank*, 684 F.3d 197, 215 (1st Cir. 2012). A common law claim is

not "per se inconsistent with [Article 4A's] regime" merely because the alleged facts include a wire transfer. *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 89 (2d Cir. 2010); *see Regions Bank v. Provident Bank, Inc.*, 345 F.3d 1267, 1274–75 (11th Cir. 2003). A court must determine whether Article 4A's "provisions protect against the type of underlying injury or misconduct alleged in a claim." *Ma*, 597 F.3d at 89–90. If Article 4A "does not protect against the underlying injury or misconduct alleged," then a common law claim is not preempted. *Patco Constr. Co.*, 684 F.3d at 215–16.

Several courts have framed the preemption inquiry as whether the common law claim arose out of a situation covered by Article 4A. *Zengen, Inc. v. Comerica Bank*, 158 P.3d 800, 808 (Cal. 2007); *Fitts v. AmSouth Bank*, 917 So.2d 818, 824 (Ala. 2005).[11] Some have articulated this concern as an additional ground for finding a claim preempted, separate from a concern that the common law claim seeks to create inconsistent rights, duties, or liabilities. *See Zengen*, 158 P.3d at 808. We prefer to view these two concerns as closely related. Both formulations are rooted in the same UCC commentary. If a scenario is squarely addressed by the particular provisions of Article 4A, then allowing the plaintiff to proceed on a common law claim based on that scenario would necessarily create rights, duties, and liabilities inconsistent with those stated in Article 4A's provisions. *See Schlegel v. Bank of America, N.A.*, 628 S.E.2d 362, 368 (Va. 2006).

When the alleged acts or omissions forming the basis for a common law claim are outside the scope of Article 4.1, the

---

[11] *See also Wright v. Citizen's Bank of E. Tennessee*, 640 F. App'x 401, 407 (6th Cir. 2016) (unpublished-nonprecedential).

claim is not preempted.[12] The Supreme Court of Virginia recognized this distinction in *Schlegel*. In that case, the Virgina court considered common law claims against a bank arising from two categories of conduct: (1) unauthorized payment orders transferring a business's funds to a former executive's account; and (2) the bank's decision to freeze the funds in the former executive's account rather than refund them after learning the payment orders were unauthorized. *Id.* at 364–65. The court held that common law claims based on the funds transfers themselves were preempted by Article 4A, but that common law claims based on the post-transfer freezing of the funds were not. *Id.* at 368. The court understood Article 4A as targeting three categories of errors: those "during the issuance and acceptance of the payment order"; those "during the execution of the payment order by the receiving bank"; and those "stem[ming] from payment issues" between senders and receiving banks. *Id.* (quoting *Sheerbonnet, Ltd. v. American Express Bank, Ltd.*, 951 F. Supp. 403, 412 (S.D.N.Y. 1995)). Because the freezing of funds did not fall into any of these categories but arose from an alleged independent deposit agreement, the court held that a common law claim based on that freezing was not covered by the provisions of Article 4A. *Id.*

We draw a similar distinction with respect to Approved Mortgage's negligence claim. Approved Mortgage presents its negligence theory as composed of three separate acts or

---

[12] *See Regions Bank*, 345 F.3d at 1275, 1279 (holding that since Article 4A is "silent with regard to claims based on the theory that the beneficiary bank accepted funds when it knew or should have known that the funds were fraudulently obtained," it "does not preempt a state law claim if money is transferred by wire to a party that knows or should have known that the funds were obtained illegally").

omissions. Truist failed to flag the AER Operations account as fraudulent based on the averted wire transfer. Truist handed over the cashier's checks to Rubiera despite the suspicious circumstances surrounding the account. Truist failed to have appropriate security procedures in place to detect suspicious activity. These acts or omissions produced two harms for Approved Mortgage. First, Truist received the transfers and credited them to the AER Operations account. Second, Truist permitted Rubiera to withdraw $546,658 in cashier's checks from that account, impeding any attempt for recovery.

A negligence claim based on this first harm, Truist's receipt of the wire transfers and depositing of the funds into the AER Operations account, is preempted by Article 4.1. Article 4.1 squarely addresses the duties of the beneficiary bank in accepting a funds transfer. Allowing a common law claim that Truist was negligent in accepting such transfers would require recognizing that Truist's duties as the beneficiary's bank extended beyond those set forth in Article 4.1 to include precautionary measures to prevent misapplied transfers. A claim based on the misapplication of funds due to lack of diligence on the part of the beneficiary's bank incontrovertibly arises from an "underlying injury or misconduct" which Article 4.1 aims to protect against. *Ma*, 597 F.3d at 89–90.

However, to the extent Approved Mortgage's negligence claim is based on the second harm, Truist's issuance of cashier's checks to Rubiera, the claim is not preempted by Article 4.1. Like the freezing of funds in *Schlegel*, this alleged harm resulted from activity beyond the scope of Article 4.1. 628

S.E.2d at 368.[13] The negligent withdrawal claim does not arise from the wire transfers themselves but from Truist's conduct after crediting the transferred funds to the AER Operations account. It exacerbates the earlier transfer injury by making the repayment contemplated by Article 4.1 more difficult and, indeed, unsure.

Article 4.1 does not preempt common law claims for post-transfer activity merely because the activity involves previously transferred funds. *See Schlegel*, 628 S.E.2d at 368. The later withdrawal of funds obtained in a transfer from the beneficiary's account is not part of the transfer.[14] Because Article 4.1 does not govern later withdrawals, Approved Mortgage's proposed duty to prevent suspicious withdrawals is not inconsistent with any duty under Article 4.1.

Truist submits that Article 4.1 "provides a comprehensive set of rules for evaluating funds transfers, and those rules do

---

[13] *See also Wright*, 640 F. App'x at 409 (distinguishing precluded claims based on bank's delay in completing a wire transfer from the non-precluded claims in *Schlegel* and other cases) (unpublished-nonprecedential).

[14] Under Article 4.1, the beneficiary's bank is obliged upon acceptance of the payment order to pay the amount of the order to the beneficiary. Ind. Code § 26-1-4.1-404(a). "If the beneficiary's bank credits an account of the beneficiary," the beneficiary's bank's payment obligation is met "when and to the extent (i) the beneficiary is notified of the right to withdraw the credit, (ii) the bank lawfully applies the credit to a debt of the beneficiary, or (iii) funds with respect to the order are otherwise made available to the beneficiary by the bank." § 26-1-4.1-405(a). "In the typical case the beneficiary is paid when the beneficiary is given notice of the right to withdraw the credit." UCC § 4-A-405, cmt. 1. There is no allegation that Truist failed to pay the transfer amounts to AER Operations.

not involve pre-transfer or post-transfer conduct."[15] It does not explain, however, why the post-transfer conduct here should be treated as within the scope of Article 4.1 despite this lack of rules governing such conduct. Article 4.1 may seek to govern all the responsibilities of a beneficiary's bank with respect to a funds transfer (including pre-transfer diligence) through the completion of the funds transfer. But Article 4.1 does not seek to affect the transferred funds indefinitely. Truist has provided no convincing rationale for why the scope of Article 4.1 extends to conduct that occurred after Truist credited the transferred funds to the AER Operations account.

To the extent that Approved Mortgage's negligence claim arises from Truist permitting Rubiera's withdrawal of cashier's checks from the AER Operations account, it is not preempted by Article 4.1. We have limited our discussion of the common law claim to this question of Article 4.1 preemption. We have not considered any other challenge to the claim's viability under Indiana law. The district court did not decide whether Truist owed a duty of care to Approved Mortgage. We leave such questions to the district court on remand.

### Conclusion

The judgment of the district court is affirmed in part and reversed in part. The case is remanded for further proceedings consistent with this opinion. The parties will bear their own costs on appeal.

AFFIRMED in part, REVERSED and REMANDED in part

---

[15] Appellee's Br. 17–18.